UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
JOANNE KIM,                                          :
                                                     :
                              Plaintiff,             :     Civil Action No.: 1:24 Civ. 05234 (JHR)
                                                     :
          v.                                         :
                                                     :     **AMENDED COMPLAINT**
REGENERON PHARMACEUTICALS, INC.,                     :
and ASHUTOSH KATIYAR,                                :
                                                     :     **Jury Trial Demanded**
                              Defendant.             :
                                                     :
---------------------------------------------------------X

Plaintiff Joanne Kim ("Plaintiff" or "Kim"), by and through her attorneys, Wigdor LLP, as and for her Amended Complaint against Defendants Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company") and Ashutosh Katiyar ("Katiyar") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      In 2020, Regeneron, a large pharmaceutical company, hired Kim, an experienced pharmaceutical professional, as its Director of Customer Insights & Analytics ("CIA"). Kim was, by all accounts, an extraordinary performer. Internal company documents described Kim as an "instrumental" employee, who "[d]emonstrates deep knowledge and experience," and who performed "[a]bove" expectations.

2.      Unfortunately, Kim's career trajectory nosedived after Kim took medical leave and Regeneron learned that she had a very sick child who would require Kim to take protected leave and require accommodations. .

3.      In or about June 2023, Kim required medical leave. Her boss, Defendant Katiyar, lashed out at Kim because he was angry about her taking leave. Indeed, when Kim returned from

1

medical leave in July 2023, Katiyar berated Kim and became so aggressive that Kim feared for her safety.

4.      In August 2023, Kim, notified Dana Jones ("Jones") in Human Resources ("HR") that her daughter (referred to herein anonymously as "Jane") suffered from a serious health condition that would likely require Kim to take medical leave, but that she was afraid of how Katiyar would react given his abusive conduct in response to Kim's medical leave.  Jones took no remedial action, nor did Jones or anyone else at Regeneron properly inform Kim that she had a legal right to take protected medical leave because of Jane's serious health condition.  As a result, Kim decided to forgo taking care of her daughter to keep her job.

5.      Subsequently, Katiyar became angry at Kim for taking two days of medical leave because she contracted COVID-19 and began taking adverse actions against Kim, including excluding her from meetings, screaming at Kim, pounding his fists on the table and falsely stating that Kim's work was not important.

6.      On January 25, 2024, Kim protested Katiyar's retaliatory conduct.  She also notified Jones in HR that she would need additional time off and flexibility to attend to Jane's health needs. Again, Jones took no remedial action.  Rather, Jones directed Kim to notify Katiyar – Kim's abuser – that she would need protected leave.

7.      On February 5, 2024, Kim sent an email to Katiyar, asking for his "support as [her] family is dealing with some serious health concerns related to [her] child."  She requested "flexibility" in her schedule as she was "navigating very difficult times."  Knowing that her request would likely enrage Katiyar, she assured him that she "take[]s her position very seriously, and will work hard to make meetings and deadline."  Four days later, Katiyar and Jones fired Kim.

2

**NATURE OF CLAIMS**

8.     Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq*. ("NYCHRL"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the American with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the New York City Administrative Code, Chapter 8: Earned Safe and Sick Time Act ("ESSTA").

**ADMINISTRATIVE PROCEDURES**

9.     Kim filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title VII and the ADA.  Kim received a Notice of Right to Sue on September 12, 2024.

10.     Pursuant to NYCHRL § 8-502, Kim will serve a copy of this Amended Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

11.     Kim has complied with all other prerequisites to filing this action.

**JURISDICTION AND VENUE**

12.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA, ADA and Title VII.  The Court has supplemental jurisdiction over Kim's related claims arising under the local laws pursuant to 28 U.S.C. § 1367(a).

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

14.     Plaintiff Joanne Kim is a woman and a primary caregiver for her minor daughter who suffers from serious health conditions and disabilities.  Kim worked in New York City as the Director of Customer Insights & Analytics of Regeneron from June 5, 2020, until the unlawful termination of her employment on February 9, 2024.  At all times, Kim was an "employee" under all relevant statutes.

15.     Defendant Regeneron is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 777 Old Saw Mill River Road, Tarrytown, New York 10591.  Regeneron invents, develops, manufactures and markets pharmaceutical products.  At all relevant times, Regeneron was an "employer" under all relevant statutes.

16.     Defendant Katiyar is the Executive Director, Commercial Insights & Analytics, Ophthalmology at Regeneron.  At all relevant times, Katiyar met the definition of Plaintiff's "employer" under all applicable statutes, including having the power to (a) control employees who reported to him; (b) hire and fire employees; and (c) supervise employees' work schedules and conditions of employment.  Upon information and belief, Katiyar is a resident of New York.  Katiyar participated in and aided or abetted the unlawful actions against Kim.

4

## FACTUAL ALLEGATIONS

**I.      Background**

17.     Kim is a Doctor of Pharmacy and a Registered Pharmacist.  She began her career as a hospital pharmacist before transitioning into pharmaceutical equity research, healthcare consulting, strategic analysis and business development.

18.     Immediately prior to working at Regeneron, Kim was the founder and managing director of Harlow Advisors, LLC, where she sourced deals for biotech/pharma partners, venture capital and investment banks; evaluated assets and therapies for inclusion in her clients' portfolios; conducted evaluations of new markets and identified potential opportunities for new business development initiatives; and provided recommendations to senior leadership about how specific deals would fit within the company's overall portfolio of products.

**II.      Regeneron Hires Kim to Create a Competitive Intelligence Department**

19.     Regeneron hired Kim on or about June 5, 2020, to be the Director, Customer Insights & Analytics ("CIA").  She agreed to take the position because she was given the opportunity to create a new department within CIA called Competitive Intelligence.

20.     Kim's role included leading the newly created CI business unit with a team of analysts to provide senior leadership with commercial key insights and implications on all clinical, regulatory and commercial competitor initiatives across key therapeutic areas.

21.     Kim reported to Arvind Balasundaram ("Balasundaram") who oversaw the entire CIA department and in mid-2022, she also began reporting to Janice Hemens ("Hemens"), who was hired to run the CI department with Balasundaram.

22.     To perform her work successfully, Kim was required to possess a deep understanding of market dynamics, competitive landscapes, and both physician and patient needs across key therapeutic areas, including ophthalmology, immunology, cardiovascular and oncology.

23.     She built the Regeneron CI Gateway, one of three main pillars for senior leaders to view all brand competitive intelligence monitoring, strategized with U.S. and Global marketing partners to evaluate potential threats, identify gaps in strategy and pressure test forecasts; analyzed multiple sources of intelligence; influenced, coordinated and partnered with launch teams at key decision points to share potential best practices in order to ensure proper launch readiness assessments; and supported new business development activities.

24.     Kim was enormously successful.  She built her CI team into a highly respected group whose work was distributed to hundreds of senior leaders, including the C-Suite.  Her work was instrumental in assisting with strategy and planning by Regeneron employees across all commercial teams, helping Regeneron to be the industry leader with their key products Dupixent and Eylea and gain a strong footing in oncology with Libtayo.

25.     Kim's leadership helped Regeneron generate billions of dollars in revenue.

26.     Kim earned excellent performance reviews, including being widely credited with doing an outstanding job of creating and leading the CI group and making it a key contributor to Customer Insights & Analytics.

27.     For example, in 2020, she received the highest-rated performance review after just six months at the Company, and in her first full-year review in 2021 under Balasundaram, Kim earned an "Above Expected" rating.  Among other things, Regeneron acknowledged that Kim:

    a)    was instrumental in setting up an infrastructure for a commercial competitive center of excellence;

    b)    was viewed by stakeholders as a partner;

c)    ensured best practices were followed, embraced innovation, promoted awareness and adoption of next-generation CI and market research tools;

d)    demonstrated an ability to problem solve and make timely decisions; and

e)    worked tirelessly but in a strategic, organized fashion.

28.    Kim often worked 14-to-16-hour days to ensure that she was meeting the needs of her clients and stakeholders.  Despite her high-pressure, high-demand job, Kim regularly met and exceeded the expectations set for her.

### III.    Kim Is Assigned to the Eylea Brand

29.    In August 2022, Regeneron restructured CI, with CI no longer operating as a separate group.  Rather, specific CI personnel would be assigned to one of the primary commercial business units, with all CI teams (market research, analytics, and so forth) reporting to a single CI business unit head for each brand.

30.    Given her success and deep expertise in ophthalmology, Kim was assigned to the Eylea (aflibercept) group, one of the Company's most profitable brands, while all other CI personnel were assigned to other brands.  This came at a time when Regeneron hoped to convert existing Eylea users to Eylea HD (aflibercept) because it was facing a potential patent expiration in 2024 and more than eight aflibercept biosimilars were expected to come to market.

31.    Katiyar was announced as the Head of the Eylea CI group, making him Kim's direct manager.  Balasundaram became Katiyar's direct manager and Kim's dotted line manager.

### IV.    Defendants Retaliate Against Kim for Seeking Medical Leave

32.    Kim's young daughter Jane suffers from serious health conditions and disabilities, including    Obsessive    Compulsive    Disorder,    Attention-Deficit/Hyperactivity    Disorder,

Trichotillomania and General Anxiety Disorder that have resulted in multiple instances of self-harm, suicidal ideation, suicide attempts, hospital stays and visits to treatment facilities and emergency rooms.  As a result of these conditions, Jane is required to attend special schools.

33.    Jane's various health conditions, all of which are demonstrable by medically accepted techniques, substantially limit the major life activities of caring for herself, learning, reading, thinking and communicating, among others.  Jane's medical conditions also substantially limit Jane's brain functions.

34.    Kim routinely kept Balasundaram updated on Jane's health and often shared the various treatment options the family was considering.  In return, Balasundaram shared his own family struggles and regularly encouraged Kim to share intimate details of her daughter's condition and care.

35.    Upon information and belief, Balasundaram began sharing that information with Katiyar when Katiyar became Kim's direct manager.

36.    Kim directly shared her daughter's health conditions with Katiyar on several occasions.  For instance, there were times when Kim needed to tell Katiyar why, for example, she had to reschedule a meeting or may be a few moments late for a phone call.

37.    Katiyar asked Kim about her daughter's health and said on a few occasions that he knew Kim was going through significant issues with Jane.  He was aware, for example, that Jane was unable to attend school because of the intensive treatment required.

38.    In January 2023, Jane's health reached a critical stage and in March 2023 she was hospitalized for another suicide attempt.  Jane's medical team also determined in March 2023 that Jane could not return to school in her current condition.

39.    Kim shared this information with Balasundaram, as she always had, and he told Kim to discuss the situation with HR.

40.    Kim then spoke to Jones in HR in March 2023 and disclosed Jane's health needs, the intensive treatment required, and that the family was working to determine next steps with respect to Jane's placement options.

41.    Although Kim asked Jones to explain the available medical leave options, Jones never informed Kim of her right to take protected leave under the FMLA.

42.    In mid-June 2023, however, Kim needed to take an unexpected six-week medical leave because of her own serious health condition and disability.  Kim broke her hand, which had to be immobilized for approximately six weeks.  During this time, Kim was substantially limited in major life activities such as caring for herself and lifting, among others.

43.    Regeneron informed Kim that her health condition was an FMLA-qualifying event. As a result, Kim exercised her right to take protected medical leave.

44.    Kim's leave also qualified as an accommodation for her disability.

45.    When Kim informed Katiyar that she needed to take leave, he panicked about how Kim's job responsibilities would be handled while she was out.  He openly expressed his frustration, complaining that Kim's leave placed a burden on him.  Katiyar ultimately decided to hire two consultants for a three-month contract to cover Kim's work while she was out.

46.    In July 2023, Kim returned after just six weeks of medical leave and attended a meeting with Katiyar to catch up on events that occurred while she was out.  Katiyar lashed out at Kim for taking leave, shouting that, in sum and substance, Kim's work was unimportant and useless (despite hiring two people to fulfill Kim's job duties while she was out on leave).  Katiyar's behavior was so hostile that Kim felt genuinely frightened.

47.     Thereafter, Katiyar refused to include Kim in meetings with stakeholders, belittled the work she performed and began engaging in escalating bouts of anger, including pounding his fists on the table and screaming at Kim.  In short, Katiyar began to treat Kim significantly worse than before her protected leave.

48.     In July 2023, Jane was hospitalized again.  Jane's medical team determined that she should be enrolled in an out-of-state program that would last for several months.

49.     When Jane's program was ending in the Fall of 2023, Jane's medical team, Kim and Kim's spouse worked to determine Jane's next steps because Jane still could not return to school at that time.

50.     As a result, in or around September 2023, Kim notified Jones that she would need time off because of Jane's health condition and disabilities.  She explained Jane's medical condition and needs in greater detail.

51.     Once again, despite knowing that Kim's leave would be for an FMLA-qualifying reason, Regeneron failed to notify Kim of her eligibility to take protected FMLA leave, inquire further about whether Kim was seeking FMLA leave, or ask Kim to fill out any FMLA forms.

52.      Ultimately, Kim did not take leave at that time because, in addition to not being informed that Jane's medical needs were an FMLA-qualifying event, she was concerned about Katiyar's aggressive response to her own medical leave and his retaliatory response upon her return.  She did not want Katiyar's behavior toward her to escalate, which she was certain another leave would cause.  Instead, Kim hired a full-time health-care practitioner to care for Jane until a plan was put in place.

53.     In December 2023, Kim contracted Covid-19 for the second time, requiring her to take two days to recover.  This also upset Katiyar, who snidely commented to Kim that it was "so

interesting that [she] caught Covid again," implying that she was being dishonest.  Kim was taken aback and said that she has young children in school, so it is not that unusual.  Katiyar looked at Kim and said "sure" and walked away.  Kim had to use two sick days while she recovered, which seemed to further enrage Katiyar.

54.    On January 24, 2024, during a one-on-one meeting with Katiyar, Kim asked to attend stakeholder meetings with him because, as she tried to explain, she was being left out of important conversations and decisions that were impacting her ability to perform her job.

55.    Katiyar again became aggressive and angry and told Kim that she would never be promoted from her current position in part because "it's all about . . . what perceptions you create to people," clearly referring Kim's requests for protected leave and her responsibilities taking care of Jane.  He lectured Kim about "team dynamics," how she "collaborate[s] with others," and how she "behave[s]."

56.    He then continued to falsely belittle the work Kim performed, stating that she only performed a "tactical function" and was "just providing some insight back to the business unit [which is] not the role that will get promoted afterwards."

57.    Nobody else at the Company had ever referred to the work Kim performed as being "tactical" or lacking value to Regeneron.  To the contrary, Kim had regularly received positive feedback about her contributions, including in her performance reviews.

58.    Kim reminded Katiyar that she built the entire CI team from the ground up and constantly strategized with brand teams and her stakeholders, including the medical team, strategic analysis, field access, market access and the market research group.

59.    However, Katiyar continued to threaten Kim that she would never get promoted to a senior director position in CI and that "the role that [she was] currently in [was] not going to

work for [her] long term." He ended the conversation by telling Kim that the role was "always gonna make [her] unhappy" and that she needed to decide what she was going to do differently.

60. Kim was deeply unsettled and upset by Katiyar's hostility and anger.

## V.     Kim Reports Katiyar's Unlawful Behavior to Human Resources

52. On January 25, 2024, Kim reported Katiyar's aggressive and unlawful behavior to Abby Cahn ("Cahn"), Executive Director of Eylea, who advised Kim to contact HR.

53. On the same day, Kim informed Jones (HR) that a senior leader of the company had been verbally abusive and threatening. Kim told Jones that she was "scared" that something would happen to her job if she made an HR complaint and that she needed to "take baby steps."

54. Kim then asked Jones to walk her through the complaint process in detail, so she was able to "really . . . understand the process and . . . make that decision whether it makes sense for [her] to even say anything."

55. Jones said that if she receives a claim of harassment or retaliation "or something like that," she would typically reach out to another HR business partner who manages employee relations investigations.

56. As Kim explained to Jones, "I am so upset by this person and how unprofessional this person was and made me feel so invalidated, feel so small, like I am worth nothing."

57. Jones explained Regeneron's general process for dealing with reports to HR, including telling Kim that "if it's something that we can investigate and make better and you would feel comfortable to stay, that would probably be the first choice."

58. Jones also urged Kim to quit. According to Jones, "if for some reason you don't want to say what it is and you're just like, 'Maybe this not the right fit for me anymore,' I do feel

like in this situation, without knowing any of the details, we probably could put together some type of package for you."

59.    Kim, who loved her job and was incredibly successful at it, immediately told Jones that was the last option she wanted to explore.  She reiterated that she was committed to Regeneron and did not want to leave.

60.    Kim shared with Jones that it was Katiyar who was subjecting her to hostile treatment and began explaining what had occurred, including that he refused to include her in meetings.

61.    She also informed Jones that Katiyar "almost attack[ed] [her] . . . when [she] asked him if he could include [her] in any conversations he may have about any kind of ad hoc projects that may come up in competitive intelligence."

62.    At the end of the scheduled call time, Kim reiterated that there was "a lot more than that" that she needed to share.

63.    On January 30, 2024, after not hearing from Jones again, Kim reached back out to Jones to finish the discussion about Katiyar.

64.    On February 1, 2024, Kim met Jones in person.  As a result of an emergent health situation occurring with Jane, Kim went into even more detail about Jane's serious health condition and disabilities, and told Jones that she needed temporary flexibility in her schedule. She specifically told Jones that she had a "special needs child" who had not been in school for the entire year and now required a "higher level of care."

65.    Kim explained that for Jane to be admitted to the program that her medical team recommended, Kim would need to drop off and pick up Jane at specific times during the day in addition to attending two-hour sessions three times a week.

66.     Kim further explained to Jones that she was the "primary caretaker" to her children due to her husband's work schedule, and the most recent health emergency made it clear that she "[couldn't] do this [her]self anymore" because "[i]t's too much."

67.     Jones understood Kim's request to be for an accommodation, as she told Kim that the Company had "an accommodation process" that would require Kim to have "a little tracker" to keep track of her time if she had a flexible schedule.

68.     However, as Kim shared, she was afraid of the backlash if she took time off for her sick child.  According to Kim, her career is so important to her and without it, "part of me feels like it dies."

69.     Kim was afraid because she knew Katiyar's behavior would escalate even further if she requested a flexible schedule, including time off, to care for Jane, and because Jones had already suggested that Kim may want to consider exiting the Company after she reported Katiyar's behavior and made prior leave requests.

70.     However, as Kim told Jones, she needed to request temporary flexibility in her schedule because she was very concerned about Katiyar's response if she missed a meeting.  Kim clarified that she was "just asking for some flexibility" given that her days could be unpredictable.

71.     Further, Kim stated that, while she understood Katiyar was her manager, she did not feel comfortable telling Katiyar anything given how he responded to her last leave.

72.     Kim told Jones again that Katiyar continued to leave her out of meetings and that Katiyar became angry at her when she asked him if she could attend meetings with him, told her that her role could be performed by an associate director, and that she would never get promoted.

73.     Rather than investigate and fix the problem, Jones excused Katiyar's unlawful behavior because, in Jones's view, he just expressed himself in a "really bad way."

14

74.    Kim pleaded with Jones, "what do I do? My hands are tied.  I would like to be here.  I would like some changes to happen.  But I don't know what to do."

75.    Once again, despite Kim clearly indicating that she was seeking a form of intermittent FMLA leave, Regeneron failed to notify her of her eligibility to take FMLA, inquire further about whether she was seeking FMLA leave, or ask her to fill out any FMLA forms.

76.    Instead, despite knowing Katiyar's aggressive and retaliatory treatment, Jones directed Kim to send an email to Katiyar setting forth the request.

## VI.    Regeneron Terminates Kim's Employment

71.    On February 5, 2024, Kim wrote Katiyar an email to request protected leave:

> I hope all is well.  I am reaching out to ask for your support as my family is dealing with some serious health concerns related to my child.  I have already reached out to Dana Jones in HR, and she and I have discussed.  I plan to continue working, and am aiming to still be able to come into the office 2 days a week (Tuesday and Wednesdays).  However, the next 6-8 weeks will be a bit of a transition, with follow up appointments, including some that may be out of state.  My hours may require me to work some non-traditional working hours during this period, where I plan to either stay up late into the evening, or wake up extra early in the mornings, to get my work done.  Please know that I take my position very seriously, and will work hard to make meetings and deadlines.  However, I ask for some flexibility and understanding, as we are navigating very difficult times.  Should there be days that require me to be out, I will let you know in advance, and use my personal days…

72.    The next day, Kim sent an Outlook meeting invitation to Sarah Cornhill ("Cornhill"), the Vice President of Commercial Strategy and Balasundaram's direct manager, hoping to discuss Katiyar's abusive behavior and her concern about continued retaliation related to her request for a temporary flexible schedule.

15

73.     Cornhill summarily declined the invitation and told Kim that she could not meet with her until after she returned from vacation on February 13, 2024.  In fact, Cornhill was in the office and present during a February 8, 2024 presentation that Kim made.

74.     On or around that same day, Kim spoke to Balasundaram about Katiyar's increasingly abusive behavior.  He, too, dismissed Kim's concerns, stating, "don't worry about him; he's harmless."

75.     On February 9, 2024 – mere days after Kim reported Katiyar's abusive behavior, expressed concern about retaliation, and asked for a temporary flexible schedule to care for her daughter – Jones and Katiyar fired Kim, effective immediately.

76.     Jones began the conversation by asking if Kim was in the office.  Kim said she was not because she was at a doctor's appointment for her daughter.

77.     Katiyar then told Kim that the role of CI within the commercial unit had become more challenging since the reorganization and claimed – falsely – that the Company decided to eliminate Kim's role.

78.     If anything, commercial intelligence and Kim's role have never been more important for Eylea.  It is a $6+ billion-dollar drug with an increasing number of competitors that is also in the launch phase of a new and improved version of the drug called Highdose.

79.     Moreover, Kim's entire CI team continued to work at Regeneron.

80.     Only Kim, who sought protected leave and accommodations, and protested unlawful retaliation, was dismissed.

81.     Kim asked to be permitted to shift into a new role.  Jones claimed that there was a hiring pause so the Company was not able to fill any roles.

82. This, too, was false. Kim's role was eliminated in name only. Regeneron hired consultants to perform Kim's responsibilities.

83. Kim then asked whether there was a performance issue and Jones said it was unrelated to performance.

84. Kim, still in shock, said to Jones that she went to her to share that she had a sick child and needed the Company's understanding with her need for a flexible schedule; that Balasundaram was aware of everything Jane has been through since the beginning; and that one week after Jones told her to inform Katiyar, she was suddenly terminated. Jones acknowledged that she and Balasundaram both knew about Kim's family situation.

**FIRST CAUSE OF ACTION**
**(Interference in Violation of FMLA)**
*Against All Defendants*

85. Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

86. At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA. Similarly, Defendants were and are each a "covered employer" within the meaning of the FMLA.

87. By the actions described Defendants unlawfully interfered with Plaintiff's FMLA rights.

88. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

89. Defendants' unlawful actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA.

17

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of FMLA)
*Against All Defendants*

90.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

91.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Similarly, Defendants were and are each a "covered employer" within the meaning of the FMLA.

92.     By the actions described above, Defendants retaliated against Plaintiff for exercising her FMLA rights.

93.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

94.     Defendants' unlawful actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of NYSHRL)
*Against all Defendants*

95.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

96.     By the actions described above, Defendants discriminated against Plaintiff based on sex, familial status, disability, and association with a person with a disability in violation of the NYSHRL.

18

97.     Specifically, under the NYSHRL, it is unlawful sex discrimination when an employee is discriminated against based upon the sex stereotype of working mothers; it is unlawful familial status discrimination to discriminate against an employee based upon their status as a parent; and it is unlawful disability discrimination when an employer makes an employment-related decisions based on an employee's disability or her association with someone with a disability.

98.     Defendant Katiyar is individually liable for participating in the unlawful acts.

99.     Defendants Katiyar is also liable as an aider and abettor under N.Y. Exec. Law § 296(6) because he aided, abetted, incited, compelled and/or coerced discrimination against Plaintiff in violation of the Executive Law.

100.     As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

101.     As a direct and proximate result of the unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

102.     Defendants' discriminatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard for Plaintiff's rights under the NYSHRL.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of NYSHRL)**
*Against all Defendants*

103. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

104. By the actions described above, Defendants retaliated against Plaintiff for seeking an accommodation and protesting discrimination and retaliation by, among other things, threatening her position, diminishing her role and terminating her employment in violation of the NYSHRL.

105. Defendant Katiyar is individually liable for participating in the unlawful acts.

106. Defendant Katiyar is also liable as an aider and abettor under N.Y. Exec. Law § 296(6) because he aided, abetted, incited, compelled and/or coerced retaliation against Plaintiff in violation of the Executive Law.

107. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

108. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

109. Defendants' retaliatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights under the NYSHRL.

### FIFTH CAUSE OF ACTION
**(Discrimination in Violation of NYCHRL)**
*Against All Defendants*

110.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

111.    By the actions described above, Defendants discriminated against Plaintiff due to sex, caregiver status, disability and association with a person with a disability, in violation of NYCHRL.

112.    Specifically, under the NYCHRL, it is unlawful sex discrimination when an employee is discriminated against based upon the sex stereotype of working mothers; it is unlawful caregiver status discrimination to discriminate against an employee based upon her responsibility to care for a person with a disability; and it is unlawful disability discrimination when an employer makes an employment-related decision based on an employee's disability and association with someone with a disability.

113.    Defendant Katiyar is individually liable under N.Y.C. Admin. Code § 8-107(1)(a), which imposes primary liability on employees who engage in discriminatory practices, and as an aider and abettor under  N.Y.C. Admin. Code. 8-107(6) because he actively participated in the conduct giving rise to the discrimination claims.

114.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

115.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence,

and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

116.    Defendants' retaliatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights under the NYSHRL.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)
#### *Against All Defendants*

117.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

118.    By the actions described above, Defendants retaliated against Plaintiff for seeking an accommodation and protesting discrimination and retaliation, including but not limited to, threatening her position, diminishing her role and terminating her employment in violation of the NYCHRL.

119.    Defendant Katiyar is individually liable under N.Y.C. Admin. Code § 8-107(1)(a), which prohibits "any person" from retaliating against another person for engaging in certain protected activities.

120.    Defendant Katiyar is also individually liable for aiding and abetting unlawful retaliation.

121.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence,

and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

123.    Defendants' retaliatory actions were willfully negligent, reckless or committed with a conscious or reckless disregard of Plaintiff's rights under the NYCHRL.

## SEVENTH CAUSE OF ACTION
### (ADA – Disability Discrimination)
*Against Defendant Regeneron*

124.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

125.    The actions of the Defendant, in subjecting Plaintiff to discrimination on the basis of her disability and her association with her disabled child, constituted violations of the ADA.

126.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

127.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## EIGHTH CAUSE OF ACTION
### (ADA – Retaliation)
*Against Defendant Regeneron*

128.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

23

129.    By the actions described above, Defendants retaliated against Plaintiff for protesting discrimination and seeking an accommodation of leave for her own disability, including but not limited to, threatening her position, diminishing her role and terminating her employment in violation of the ADA.

130.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

131.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

**NINTH CAUSE OF ACTION**
**(TITLE VII – Discrimination)**
*Against Defendant Regeneron*

132.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

133.    By the actions described above, among others, Defendant Regeneron discriminated against Plaintiff on the basis of her sex in violation of Title VII.

134.    As a direct and proximate result of Defendant Regeneron's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of money damages, in addition to reasonable attorneys' fees and costs.

135.    As a direct and proximate result of Defendant Regeneron's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

136.    Defendant Regeneron's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**(TITLE VII – Retaliation)**
***Against Defendant Regeneron***

137.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

138.    By the actions described above, among others, Defendant Regeneron retaliated against Plaintiff for reporting discriminatory and retaliatory behavior and engaging in protected activity under Title VII.

139.    As a direct and proximate result of Defendant Regeneron's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of money damages, in addition to reasonable attorneys' fees and costs.

140.    As a direct and proximate result of Defendant Regeneron's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

141.    Defendant Regeneron's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(ESSTA – Retaliation and Interference)**
**Against Defendant Regeneron**

142.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

143.    By the actions described above, among others, Defendant Regeneron interfered with Plaintiff's right to take sick time to care for a family member who required care or treatment of a mental or physical illness by engaging in acts of intimidation, harassment and threats against Plaintiff.

144.    By the actions described above, among others, Defendant Regeneron retaliated against Plaintiff for attempting to exercise her rights under ESSTA by threatening her position, diminishing her role and terminating her employment in violation of the ESSTA.

145.    As a direct and proximate result of Defendant Regeneron's unlawful interference and retaliatory conduct in violation of ESSTA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of money damages, in addition to reasonable attorneys' fees and costs.

146.    As a direct and proximate result of Defendant Regeneron's unlawful interference and retaliatory conduct in violation of ESSTA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.    A declaratory judgment that the actions of Defendants complained of herein violate federal and state laws;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

E.    An award of punitive damages, in an amount to be determined at trial;

F.    An award of liquidated damages, in an amount to be determined at trial;

G.    Prejudgment interest on all amounts due;

H.    An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and,

I.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 7, 2024
       New York, New York             Respectfully submitted,

                            **WIGDOR LLP**

By: _____
             Valdi Licul
             Monica Hincken

85 Fifth Avenue
New York, NY  10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
mhincken@wigdorlaw.com

*Counsel for Plaintiff*

28