**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

JOANNE KIM,                                            :
                                                       :
                          Plaintiff,                   :        Civil Action No.: 1:24 Civ. 05234 (JHR)
                                                       :
            v.                                         :
                                                       :
REGENERON PHARMACEUTICALS, INC.,                       :
and ASHUTOSH KATIYAR,                                  :
                                                       :
                          Defendants.                  :
                                                       :
-----------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT</u>

**WIGDOR LLP**

Monica Hincken
Valdi Licul

85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mhincken@wigdorlaw.com
vlicul@wigdorlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................. iii

STATEMENT OF FACTS .................................................................................................................1

I.     Background ...............................................................................................................................1

II.    Kim Requires Medical Leave and Immediately Faces Katiyar's Hostile Treatment and Retaliation ..............................................................................................................................1

III.   Kim Requires Additional Leave, Which Further Enrages Katiyar .......................................3

IV.   Kim Reports Katiyar's Unlawful Behavior to Human Resources .......................................4

V.    Regeneron Terminates Kim's Employment ........................................................................7

ARGUMENT ....................................................................................................................................8

I.     The Motion to Dismiss Standard .........................................................................................8

II.    Discrimination Based on Sex, Association with a Person with a Disability, Caregiver Status and Familial Status ....................................................................................................9

III.   Disability Discrimination ....................................................................................................13

IV.   Retaliation ...........................................................................................................................18

V.    Individual Liability .............................................................................................................20

VI.   The Earned Safe and Sick Time Act...................................................................................21

CONCLUSION................................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

Arista Records, LLC v. Doe 3,
    604 F.3d 110 (2d Cir. 2010) .................................................................................................. 9

Ashcroft v. Iqbal,
    556 U.S. 662 (2009).......................................................................................................... 8, 9

Back v. Hastings On Hudson Union Free School District,
    365 F.3d 107 (2d Cir. 2004) ........................................................................................ 10, 14

Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC,
    15 F. Supp. 3d 274 (E.D.N.Y. 2014) ................................................................................. 16

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007).......................................................................................................... 8, 9

Bellaver v. Quanex Corp.,
    200 F.3d 485 (7th Cir. 2000)............................................................................................... 13

Billue v. Praxair, Inc.,
    No. 3:05 Civ. 00170 (JCH), 2007 WL 1231841 (D. Conn. Apr. 26, 2007) ...................... 17

Bonaffini v. City Univ. of New York,
    No. 20 Civ. 5118 (BMC), 2021 WL 2895688 (E.D.N.Y. July 9, 2021)............................ 20

Callahan v. HSBC Securities (USA) Inc.,
    723 F. Supp. 3d 315 (S.D.N.Y. 2024) ......................................................................... 21, 22

Canales v. ACP Facility Servs., Inc.,
    No. 2017 Civ. 6937 (DRH) (AYS), 2019 WL 1171479, at *4 (E.D.N.Y. Mar. 13, 2019)........ 10

Chepak v. Metro. Hosp.,
    555 Fed. App'x 74 (2d Cir. 2014) ........................................................................................ 8

Conklin v. County of Suffolk,
    859 F. Supp. 2d 415 (E.D.N.Y. 2012) ............................................................................... 20

Crawford v. Metro. Gov't of Nashville & Davidson Cnty. Tenn.,
    555 U.S. 271 (2009)............................................................................................................ 18

Dingman v. Fuji Japanese Steakhouse Sushi Inc.,
    No. 20 Civ. 4850 (NSR), 2022 WL 4650860 (S.D.N.Y. Sept. 30, 2022)........................... 10

Doe v. Bloomberg, L.P.,
  36 N.Y.3d 450 (2021) .................................................................................................... 20

Doe v. Columbia Univ.,
  831 F.3d 46 (2d Cir. 2016) ............................................................................................. 9

East v. Roosevelt Union Free Sch. Dist.,
  No. 19 Civ. 3709 (JS) (AKT), 2020 WL 13753159 (E.D.N.Y. July 31, 2020) ......................... 14

Espinal v. Goord,
  558 F.3d 119 (2d Cir. 2009) ......................................................................................... 17

Farmer v. Shake Shack Enterprises, LLC,
  473 F. Supp. 3d (S.D.N.Y. 2020) ................................................................................... 18

Feingold v. New York,
  366 F.3d 138 (2d Cir. 2004) ......................................................................................... 20

Gallardo v. IEH Corp.,
  No. 21 Civ. 3257 (LDH), 2022 WL 4646514 (E.D.N.Y. Oct. 1, 2022) .................................... 14

Graziadio v. Culinary Inst. of Am.,
  817 F.3d 415 (2d Cir. 2016) .................................................................................... 10, 13

Gross v. FBL Fin. Servs., Inc.,
  557 U.S. 167 (2009) ...................................................................................................... 12

Holtz v. Rockefeller & Co.,
  258 F.3d 62 (2d Cir. 2001) .............................................................................................. 11

Hubbard v. Total Comm'ns, Inc.,
  347 F. App'x 679 (2d Cir. 2009) .................................................................................... 18

Katz v. Adecco USA, Inc.,
  845 F. Supp. 3d 539 (S.D.N.Y. 2012) ............................................................................ 15

Kelleher v. Fred A. Cook, Inc.,
  939 F.3d 465 (2d Cir. 2019) ........................................................................ 10, 12, 13, 15

Kerzer v. Kingly Mfg.,
  156 F.3d 396 (2d Cir. 1998) ......................................................................................... 14

Kirkland-Hudson v. Mount Vernon City Sch. Dist.,
  665 F. Supp. 3d 412 (S.D.N.Y. 2023) ..................................................................... 15, 16

Laudadio v. Johanns,
    677 F. Supp. 3d 590 (E.D.N.Y. 2010) ................................................................ 17

Limauro v. Consol. Edison Co. of New York, Inc.,
    No. 20 Civ. 03558 (CM), 2021 WL 466952 (S.D.N.Y. Feb. 9, 2021) ...................................... 18

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015) ...................................................................9, 11, 15, 18

Malena v. Victoria's Secret Direct, LLC,
    886 F. Supp. 2d 349 (S.D.N.Y. Aug. 16, 2012) ........................................................ 18

Mauro v. N.Y.C. Dep't of Educ.,
    No. 21-2671, 2022 WL 17844438 (2d Cir. 2022) ........................................................ 9

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
    715 F.3d 102 (2d Cir. 2013) ...................................................................11, 18

Miller v. Levi & Korsinsky, LLP,
    695 F. Supp. 3d 397 (S.D.N.Y. 2023) ................................................................ 10

Montana v. First Fed. Sav. and Loan Ass'n of Rochester,
    869 F.2d 100 (2d Cir. 1989) ........................................................................ 14

Nev. Dep't of Human Res. v. Hibbs,
    538 U.S. 721 (1982) ............................................................................... 10

Parker v. Columbia Pictures Indus.,
    204 F.3d 326 (2d Cir. 2000) ........................................................................11

Strattor v. Dep't for the Aging for the City of N.Y.,
    132 F.3d 869 (2d Cir. 1997) ........................................................................ 13

Tolbert v. Smith,
    790 F.3d 427 (2d Cir. 2015) ........................................................................ 12

Tomassi v. Insignia Fin. Grp., Inc.,
    478 F.3d 111 (2d Cir. 2007) ........................................................................ 12

Vale v. Great Neck Water Pollution Control Dist.,
    80 F. Supp. 3d 426 (E.D.N.Y. 2015) ................................................................ 17

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015) ......................................................................... 9

Wellner v. Montefiore Med. Ctr.,
 No. 17 Civ. 3479 (KPF), 2019 WL 4081898 n.4 (S.D.N.Y. 2019) ............................................11

Xiang v. Eagle Enters., LLC,
 No. 19 Civ. 1752 (PAE), 2020 WL 248941 (S.D.N.Y. 2020) ..................................................... 20

Zann Kwan v. Andalex Grp. LLC,
 737 F.3d 834 (2d Cir. 2013) ...................................................................................................11

Zoulas v. New York City Dep't of Educ.,
 400 F. Supp. 3d 25 (S.D.N.Y. 2019) .......................................................................................11

**Statutes**

42 U.S.C. § 12102........................................................................................................... 9

42 U.S.C. § 12112(b)(4)................................................................................................ 10

42 U.S.C. §§ 2000e ........................................................................................................ 9

N.Y. Exec. Law § 296(6) ............................................................................................ 20

N.Y. Exec. Law §§ 290 ................................................................................................. 9

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 1

**Regulations**

N.Y.C. Admin. Code § 8-107..................................................................................11, 20

N.Y.C. Admin. Code § 20-924.................................................................................... 21

N.Y.C. Admin. Code §§ 8-101 ..................................................................................... 9

N.Y.C. Code § 8-102....................................................................................................11

Plaintiff Joanne Kim ("Kim") submits this memorandum of law in opposition to the Partial Motion to Dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 18, "Defs. Brf.") filed by Defendants Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company") and Ashutosh Katiyar ("Katiyar") (collectively, "Defendants").  For the reasons set forth below, Defendants' Partial Motion should be denied in its entirety.

## STATEMENT OF FACTS

### I.    Background

In 2020, Regeneron, a large pharmaceutical company, hired Kim as its Director of Customer Insights & Analytics ("CIA") with the directive to create a new department within CIA called Competitive Intelligence ("CI").  See Dkt. No. 15 ("FAC") ¶¶ 19-20.  Kim was enormously successful in building a highly respected CI team and earned excellent performance reviews.  Id. ¶¶ 24-27.  In August 2022, Regeneron restructured CI, with CI no longer operating as a separate group.  Instead, specific CI personnel were assigned to one of Regeneron's primary commercial business units.  Id. ¶ 29.  Kim was assigned to the Eylea (afibercept) group, one of the Company's most profitable brands, at a time when Regeneron hoped to convert existing Eylea users to Eylea HD (aflibercept) because it was facing potential patent expiration in 2024.  Id. ¶ 30.  Defendant Katiyar was then announced as the Head of the Eylea CI group, making him Kim's direct manager.  Id. ¶ 31.  Kim's previous manager, Arvind Balasundaram ("Balasundaram"), became her dotted line manager.  Id.

### II.    Kim Requires Medical Leave and Immediately Faces Katiyar's Hostile Treatment and Retaliation

Kim's young daughter Jane suffers from serious health conditions and disabilities, including Obsessive Compulsive Disorder, Attention-Deficit/Hyperactivity Disorder,

Trichotillomania and General Anxiety Disorder that have resulted in multiple instances of self-harm, suicidal ideation, suicide attempts, hospital stays and visits to treatment facilities and emergency rooms. Id. ¶ 32. As a result of these conditions, Jane is required to attend special schools. Id. While working under Balasundaram, Kim regularly kept him updated on Jane's health conditions and the various treatment options the family was considering. Id. ¶ 34.

Upon information and belief, Balasundaram shared that information with Katiyar when he became Kim's direct manager. Id. ¶ 35. Kim also directly shared her daughter's health conditions with Katiyar on several occasions, and he was aware that Jane was unable to attend school because of the intensive treatment she required. Id. ¶¶ 36-37.

In March 2023, Jane's health became critical, and Kim spoke to Dana Jones ("Jones") in Human Resources ("HR"). Id. ¶ 40. Kim disclosed Jane's health needs, the intensive treatment required, and that the family was working to determine next steps with respect to Jane's placement options. Id. Although Kim asked Jones to explain the available medical leave options, Jones never informed Kim of her right to take protected leave under the FMLA. Id. ¶ 41.

Around the same time, however, Kim needed to take an unexpected six-week medical leave because of her own serious health condition and disability after she broke her hand, which had to be immobilized for approximately six weeks. Id. ¶ 42. Regeneron informed Kim that her health condition was an FMLA-qualifying event. Id. ¶ 43. As a result, Kim exercised her right to take protected medical leave, which also qualified as an accommodation for her disability Id. ¶¶ 43-44.

When Katiyar discovered that Kim needed to take leave, he panicked about how Kim's job responsibilities would be handled while she was out. Id. ¶ 45. He openly expressed his

2

frustration, complaining that Kim's leave placed a burden on him.  Id.  Katiyar ultimately decided to hire two consultants for a three-month contract to cover Kim's work while she was out. Id.

In July 2023, Kim returned after six weeks of medical leave and attended a meeting with Katiyar to catch up on events that occurred while she was out, where he lashed out at Kim for taking leave, shouting that, in sum and substance, Kim's work was unimportant and useless (despite hiring two people to fulfill Kim's job duties while she was out on leave).  Id. ¶ 46. Katiyar's behavior was so hostile that Kim felt genuinely frightened.  Id.  Katiyar then began refusing to include Kim in meetings with stakeholders, belittling the work she performed and began engaging in escalating bouts of anger, including pounding his fists on the table and screaming at Kim.  In short, Katiyar began to treat Kim significantly worse than before her protected leave.  Id. ¶ 47.

III.    **Kim Requires Additional Leave, Which Further Enrages Katiyar**

In September 2023, Kim contacted Jones again to explain Jane's medical condition in greater detail and tell her that she would need time off because of Jane's worsening health condition and disabilities.  Id. ¶ 50.  Once again, despite knowing that Kim's leave would be for an FMLA-qualifying reason, Regeneron failed to notify Kim of her eligibility to take protected FMLA leave, inquire further about whether Kim was seeking FMLA leave, or ask Kim to fill out any FMLA forms.  Id. ¶ 51.  Ultimately, Kim did not take leave at that time because, in addition to not being informed that Jane's medical needs were an FMLA-qualifying event, she was concerned about Katiyar's aggressive response to her own medical leave and his retaliatory

3

response upon her return.  Id. Section IV ¶ 52.[1]  She did not want Katiyar's behavior toward her to escalate, which she was certain another leave would cause.  Id.

Unfortunately, in December 2023, Kim contracted Covid-19 for the second time, requiring her to take two days to recover.  Id. Section IV ¶ 53.  This also upset Katiyar, who snidely commented to Kim that it was "so interesting that [she] caught Covid again," implying that she was being dishonest.  Id.  Kim was taken aback and said that she had young children in school, so it was not that unusual.  Katiyar looked at Kim and said "sure" and walked away.  Id.  Kim had to use two sick days while she recovered, which seemed to further enrage Katiyar.  Id.

On January 24, 2024, during a one-on-one meeting with Katiyar, Kim asked to attend stakeholder meetings with him because, as she tried to explain, she was being left out of important conversations and decisions that were impacting her ability to perform her job.  Id. Section IV ¶ 54.  Katiyar became aggressive and angry and told Kim that she would never be promoted from her current position in part because "it's all about . . . what perceptions you create to people," clearly referring Kim's requests for protected leave and her responsibilities taking care of Jane.  Id.  Katiyar continued to threaten Kim that she would never get promoted to a senior director position in CI and that "the role that [she was] currently in [was] not going to work for [her] long term."  Id. Section IV ¶ 59.  Kim was deeply unsettled and upset by Katiyar's hostility and anger.  Id.

IV.    **Kim Reports Katiyar's Unlawful Behavior to Human Resources**

On January 25, 2024, Kim reported Katiyar's aggressive and unlawful behavior to Abby Cahn ("Cahn"), Executive Director of Eylea, who advised Kim to contact HR, which she did.  Id.

---

[1]    Due to a drafting error, the paragraph numbers 52-60 and 71-76 appear twice in the FAC. In order to assist the Court, Plaintiff is identifying the section and paragraph numbers for the affected paragraphs. We apologize for the error.

Section V ¶¶ 52-53.  After Kim told Jones how scared she was that something would happen to her job if she made an HR complaint, Jones explained Regeneron's general process for dealing with reports to HR.  Id. Section V ¶¶ 53, 57.  During the conversation, Jones urged Kim to quit when she said, "if for some reason you don't want to say what it is and you're just like, 'Maybe this not the right fit for me anymore,' I do feel like in this situation, without knowing any of the details, we probably could put together some type of package for you."  Id. Section V ¶ 58.  Kim, who loved her job and was incredibly successful at it, immediately told Jones that was the last option she wanted to explore and reiterated her commitment to Regeneron.  Id. Section V ¶ 59.

Kim then shared that it was Katiyar who was subjecting her to hostile treatment and began explaining what had occurred, including that he refused to include her in meetings.  Id. Section V ¶ 60.  She also informed Jones that Katiyar "almost attack[ed] [her] . . . when [she] asked him if he could include [her] in any conversations he may have about any kind of ad hoc projects that may come up in competitive intelligence."  Id. ¶ 61.

At the end of the scheduled call time, Kim reiterated that there was "a lot more than that" that she needed to share.  Id. ¶ 62.  After not hearing from Jones again, Kim reached back out to Jones to finish the discussion about Katiyar.  Id. ¶ 63.  On February 1, 2024, Kim met Jones in person.  Id. ¶ 64.  As a result of an emergent health situation occurring with Jane, Kim first went into even more detail about Jane's serious health condition and disabilities and told Jones that she needed temporary flexibility in her schedule.  Id.  She specifically told Jones that she had a "special needs child" who had not been in school for the entire year and now required a "higher level of care."  Id.  Kim explained that in order for Jane to be admitted to the program that her medical team recommended, Kim would need to drop off and pick up Jane at specific times during the day in addition to attending two-hour sessions three times a week.  Id. ¶ 65.  Kim

further explained to Jones that she was the "primary caretaker" to her children due to her husband's work schedule, and the most recent health emergency made it clear that she "[couldn't] do this [her]self anymore" because "[i]t's too much." Id. ¶ 66.

Jones understood Kim's request to be for an accommodation, as she told Kim that the Company had "an accommodation process" that would require Kim to have "a little tracker" to keep track of her time if she had a flexible schedule. Id. ¶ 67. Kim shared with Jones that she was afraid of the backlash if she took time off for her sick child. Id. ¶ 68. She was afraid because she knew Katiyar's behavior would escalate even further if she requested a flexible schedule, including time off, to care for Jane, and because Jones had already suggested that Kim may want to consider exiting the Company after she reported Katiyar's behavior and made prior leave requests. Id. ¶ 69.

Despite her concern, Kim told Jones that she needed to request temporary flexibility in her schedule because she was very concerned about Katiyar's response if she missed a meeting, and further clarified that she was "just asking for some flexibility" given that her days could be unpredictable. Id. ¶ 70. Kim also told Jones that while she understood Katiyar was her manager, she did not feel comfortable telling Katiyar anything given how he responded to her last leave, particularly given that Katiyar continued to leave her out of meetings, became angry at her when she asked him if she could attend meetings with him, said that her role could be performed by an associate director, and told her that she would never get promoted. Id. Section V ¶¶ 71-72.

Rather than investigate and fix the problem, Jones excused Katiyar's unlawful behavior because, in Jones's view, he just expressed himself in a "really bad way." Id. Section V ¶ 73. Kim pleaded with Jones, "what do I do? My hands are tied. I would like to be here. I would like some changes to happen. But I don't know what to do." Id. Section V ¶ 74.

6

Once again, despite Kim clearly indicating that she was seeking a form of intermittent FMLA leave, Regeneron failed to notify her of her eligibility to take FMLA, inquire further about whether she was seeking FMLA leave, or ask her to fill out any FMLA forms. Id. Section V ¶ 75. Instead, despite knowing Katiyar's aggressive and retaliatory treatment, Jones directed Kim to send an email to Katiyar setting forth the request. Id. Section V ¶ 76.

## V.       Regeneron Terminates Kim's Employment

On February 5, 2024, Kim wrote Katiyar an email to request protected leave:

> I hope all is well. I am reaching out to ask for your support as my family is dealing with some serious health concerns related to my child. I have already reached out to Dana Jones in HR, and she and I have discussed. I plan to continue working, and am aiming to still be able to come into the office 2 days a week (Tuesday and Wednesdays). However, the next 6-8 weeks will be a bit of a transition, with follow up appointments, including some that may be out of state. My hours may require me to work some non-traditional working hours during this period, where I plan to either stay up late into the evening, or wake up extra early in the mornings, to get my work done. Please know that I take my position very seriously, and will work hard to make meetings and deadlines. However, I ask for some flexibility and understanding, as we are navigating very difficult times. Should there be days that require me to be out, I will let you know in advance, and use my personal days…

Id. Section VI ¶ 71.

The next day, Kim sent an Outlook meeting invitation to Sarah Cornhill ("Cornhill"), the Vice President of Commercial Strategy and Balasundaram's direct manager, hoping to discuss Katiyar's abusive behavior and her concern about continued retaliation related to her request for a temporary flexible schedule. Id. Section VI ¶ 72. Cornhill summarily declined the invitation and told Kim that she could not meet with her until after she returned from vacation on February 13, 2024, despite being in the office and present during a February 8, 2024 presentation that Kim made. Id. Section VI ¶ 73. On or around that same day, Kim spoke to Balasundaram about

Katiyar's increasingly abusive behavior.  He, too, dismissed Kim's concerns, stating, "don't worry about him; he's harmless."  Id. Section VI ¶ 74.

On February 9, 2024 – mere days after Kim reported Katiyar's abusive behavior, expressed concern about retaliation, and asked for a temporary flexible schedule to care for her daughter – Jones and Katiyar fired Kim, effective immediately.  Id. Section VI ¶ 75.  Despite claiming that Kim's role was being eliminated, the role was eliminated in name only, as Regeneron simply hired consultants to perform Kim's responsibilities, and her entire team continued to work at the Company.  Id. ¶¶ 77, 79, 82.

## ARGUMENT

### I.    The Motion to Dismiss Standard

A complaint is sufficient where it asserts "enough facts to state a claim that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted).  The standard is one of "flexible plausibility," "requiring a pleader to amplify her complaint with sufficient factual allegations to 'nudge [her] claims across the line from conceivable to plausible.'"  Chepak v. Metro. Hosp., 555 Fed. App'x 74, 76 (2d Cir. 2014) (quoting Twombly, 550 U.S. at 570).

When reviewing a motion to dismiss, a court must "assume [the] veracity" of the allegations set forth, draw all "reasonable inference[es]" in the plaintiff's favor and use its "judicial experience and common sense" to conduct a "context specific" analysis of the

complaint.  Ashcroft, 556 U.S. at 678-79.  The plaintiff is not required to plead "specific evidence" explaining precisely how the defendant's conduct was unlawful, Arista Records, LLC v. Doe 3, 604 F.3d 110, 119-21 (2d Cir. 2010), but only facts sufficient to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  Twombly, 550 U.S. at 555 (internal citations omitted).

Contrary to Defendants' argument, Defs. Brf. at 8, the Second Circuit has made clear that the plaintiff is "not required to plead a prima facie case of discrimination."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 84 (2d Cir. 2015).  She is not even required to "give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination."  Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015).  She "need only give plausible support to a minimal inference of discriminatory motivation."  Id. Indeed, the Second Circuit has "often vacated improper dismissals in discrimination cases where courts apply overly stringent pleading standards, cautioning against imposing 'too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage.'"  Mauro v. N.Y.C. Dep't of Educ., No. 21-2671, 2022 WL 17844438, *2 (2d Cir. 2022) (quoting Doe v. Columbia Univ., 831 F.3d 46, 55 n.8 (2d Cir. 2016)).

## II.    Discrimination Based on Sex, Association with a Person with a Disability, Caregiver Status and Familial Status

Federal and local laws prohibit discrimination based on sex, association with a person with a disability, caregiver status and familial status.  See Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); Americans with Disabilities Act, 42 U.S.C. § 12102 et seq. ("ADA"); New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. (the "NYSHRL" or "State Law"); New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. (the "NYCHRL" or "City Law").

9

"Title VII prohibits discrimination based on sex-based stereotypes," Dingman v. Fuji Japanese Steakhouse Sushi Inc., No. 20 Civ. 4850 (NSR), 2022 WL 4650860, at *7 (S.D.N.Y. Sept. 30, 2022), such as "stereotyping women as caregivers." Back v. Hastings On Hudson Union Free School District, 365 F.3d 107, 124 (2d Cir. 2004). Thus, "the notion that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender based." Id. 365 F.3d at 117. Indeed, the Supreme Court has lamented "[s]tereotypes about women's domestic roles," including the stereotypical belief of "the family as the woman's domain," Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 736 (1982), and thus "'explicitly called out the stereotype that 'women's family duties trump those of the workplace,' a 'gender stereotype.'" Back, 365 F.3d at 121 (quoting Hibbs 538 U.S. at 1979, n. 5).

The ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Thus, an employer may not discriminate based on its "fears that the employee will be inattentive at work due to the disability of [a] disabled person." Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 432 (2d Cir. 2016). Likewise, "an employer's *reaction*" to an employee's request for an accommodation to take care of a disabled child "can support an inference that a subsequent action was motivated by associational discrimination." Kelleher v. Fred A. Cook, Inc., 939 F.3d 465, 469 (2d Cir. 2019) (emphasis in original).

The NYSHRL also prohibits discrimination based on sex-based stereotypes, Miller v. Levi & Korsinsky, LLP, 695 F. Supp. 3d 397, 412 (S.D.N.Y. 2023), associational disability, Canales v. ACP Facility Servs., Inc., No. 2017 Civ. 6937 (DRH) (AYS), 2019 WL 1171479, at

10

*4 (E.D.N.Y. Mar. 13, 2019), and parental status.  N.Y. Human Rights Law § 296.1.  And, finally, NYCHRL bars sex-based discrimination, Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013), associational discrimination, N.Y. Admin. Code § 8-107(20), and discrimination based on an employee's "actual or perceived . . . caregiver status." N.Y. Admin. Code § 8-107(1)(a).  The local statutes define a caregiver as "a person who provides direct and ongoing care for a minor child or a care recipient." N.Y.C. Code § 8-102.[2]

Here, Kim's factual allegations are more than sufficient to "give plausible support to a minimal inference of discriminatory motivation" under the federal and local statutes.  Littlejohn, 795 F.3d at 306.  First, temporal proximity, including the "sequence of events leading to plaintiff's discharge," is a significant indicator of unlawful conduct.  Littlejohn, 795 F.3d at 312. Since 2020, when Kim was hired, she was consistently praised not only for her excellent performance, but also for being "instrumental" to the Company.  FAC ¶¶ 1, 27.  Her career began to "nosedive[]" in the fall of 2023 when she told Human Resources ("HR") and Katiyar that her daughter suffered from a serious health condition that would require Kim to eventually

---

[2]     The statutes vary with respect to an employee's ultimate burden of proof.  Under the NYCHRL, an employee prevails where the evidence shows that the prohibited factor played any role in the adverse action.  Mihalik, 715 F.3d at 116.  The NYSHRL was amended in 2019 "to render the standard for claims [under the NYSHRL] closer to the standard under the NYCHRL." Wellner v. Montefiore Med. Ctr., No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. 2019).  Under Title VII, a plaintiff prevails where the prohibited factor was a "motivating factor."  Holtz v. Rockefeller & Co., 258 F.3d 62, 78 (2d Cir. 2001).  Under the ADA, the employee must show "but-for" causation.  Parker v. Columbia Pictures Indus., 204 F.3d 326, 336 (2d Cir. 2000).  However, but-for causation does not require proof that discrimination was the only cause of the employer's action, but only that the [dismissal] would not have occurred in the absence of the retaliatory motive."  Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).  There can be "multiple 'but-for' causes, each one of which may be sufficient to support liability."  Id. at 846 n.5.  These differing evidentiary standards, however, are immaterial for purposes of this motion because "a plaintiff's pleading standard does not track the burden of proof."  Zoulas v. New York City Dep't of Educ., 400 F. Supp. 3d 25, 52 (S.D.N.Y. 2019).  As explained above, Kim need only satisfy "Rule 8's simplified notice pleading standard."  Id.

11

take medical leave.  Id. ¶¶ 2, 4, 36-37, 50.  On February 1, 2024, Kim told HR that she "had a 'special needs child' who had not been in school for the entire year and now required a 'higher level of care,'" id. ¶ 64, and that "she was the 'primary caretaker'" for her child.  Id. ¶ 66.  On February 5, 2024, Kim sent an email to her boss Katiyar "asking for his 'support as [her] family is dealing with some health concerns related to [her] child,'" and requesting "flexibility" in her schedule, promising to "work hard to make meetings and deadline."  Id. ¶ 7.  Katiyar fired Kim four days later.  Id. ¶ 7.  These allegations, showing that Kim was fired shortly after she notified her employer that she is a mother who would need to attend to the needs of her sick child, are more than enough to make it plausible that Defendants violated federal, state and local laws making it unlawful to discriminate against on the basis of Kim's sex, association with her disabled child, caregiver status and familial status.  See Kelleher, 939 F.3d at 470 (denying motion to dismiss where, *inter alia*, employee "was effectively demoted after he missed a day's work to care for his daughter").

Second, comments can show discrimination.  "The relevance of discrimination-related remarks does not demand on their offensiveness, but rather on their tendency to show that a decision-maker was motivated by assumptions or attitudes relating to the protected class." Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 116 (2d Cir. 2007), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).  A plaintiff "need not show that the [decision-maker] declared that [the adverse action] was tied" to the employee's protected status. Tolbert v. Smith, 790 F.3d 427, 438 (2d Cir. 2015).  "Statements showing the employer's bias" are sufficient.  Id.  Here, after Kim informed Defendants that she would need flexibility because of her child's disabilities, Katiyar became aggressive and angry and told Kim that she would never be promoted from her current position in part because "it's all about … what perceptions

12

you create to people," referring to Kim's requests for protected leave and her responsibilities taking care of Jane, FAC ¶ 55; that Kim's worked lacked value despite Kim regularly receiving positive reviews and being deemed "instrumental," id. ¶¶ 56-57, which is coded language that working mothers are often subjected to in the workplace; and threatened Kim's job by telling her that it would not work out for her long term. Id. ¶ 59. Even HR attempted to convince Kim to quit. Id. ¶ 58 (suggesting that "[m]aybe this is not the right fit for [Kim] anymore" and offering to "put together some type of package").[3]

Third, pretext can "constitute powerful evidence of discrimination." Strattor v. Dep't for the Aging for the City of N.Y., 132 F.3d 869, 879 (2d Cir. 1997) (quotation marks omitted). An employee can establish pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's legitimate non[discriminatory] reasons for its actions. From such discrepancies, a [factfinder] could conclude that the explanations were a pretext for a prohibited reason." Graziadio, 817 F.3d at 430. Here, Defendants attempted to justify Kim's dismissal by claiming that her job had been eliminated. FAC ¶ 77. In fact, Kim's role had "never been more important" to the Company, given that Kim was working on a "$6+ billion-dollar drug with an increasing number of competitors" that was in the "launch phase of a new and improved" version. Id. ¶ 78.

Fourth, an inference of "discrimination arises in single-discharge cases called 'mini-RIFs.'" Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir. 2000). Here, Kim was the only

---

[3]     Defendants argue that the "alleged mistreatment had nothing to do with [Kim's] status as a mother or caretaker, or association with someone with a disability, but focused exclusively on her requests for time off." Defs. Br. at 10. But this hardly helps their position. As the Second Circuit has made clear, "an employer's *reaction*" to an employee's request for an accommodation to take care of a disabled child (here, criticizing how Kim was perceived and trying to get her to quit), "can support an inference that a subsequent action was motivated by associational discrimination." Kelleher, 939 F.3d at 469 (emphasis in original).

member of her group whose role was "eliminated," FAC ¶ 80, while her entire "team continued to work at" the Company." Id. ¶ 79.

Fifth, an inference of discrimination arises where the purportedly non-essential employee was "replaced." Kerzer v. Kingly Mfg., 156 F.3d 396, 402 (2d Cir. 1998); see Montana v. First Fed. Sav. and Loan Ass'n of Rochester, 869 F.2d 100, 105 (2d Cir. 1989) (drawing inference of discrimination where purported job elimination was followed by an increase in the number of employees in the same department). Here, the Company claimed that Kim's job had been eliminated but then "hired consultants to perform [her] responsibilities." FAC ¶ 82.

Defendants nevertheless insist that, to state a claim, Kim was required to allege that "non-parent employees were treated better" and that Defendants "displayed animosity or hostility toward her when she talked about her daughter." Defs Br. at 9. But this is simply not true. It is well established that even at the summary judgment stage, "a plaintiff is not limited to relying exclusively on stereotyped remarks or comparative evidence of how fathers were treated to sufficiently plead a sex plus discrimination claim based on the stereotyping of working mothers." East v. Roosevelt Union Free Sch. Dist., No. 19 Civ. 3709 (JS) (AKT), 2020 WL 13753159, at *9 (E.D.N.Y. July 31, 2020); see also Back., 365 F.3d 107, 121 (2d Cir. 2004) ("Defendants are thus wrong in their contention that [plaintiff] cannot make out a claim that survives summary judgment unless she demonstrates that the defendants treated similarly situated men differently.").[4]

---

[4]    Gallardo v. IEH Corp., No. 21 Civ. 3257 (LDH), 2022 WL 4646514, at *6 (E.D.N.Y. Oct. 1, 2022), relied on by Defendants, is wholly inapposite. In Gallardo, the plaintiff alleged only one "stray" remark regarding single mothers, which the court found insufficient to raise an inference of discrimination. Here, Kim has proof of timing, numerous discriminatory comments and pretext, among other things.

14

Finally, Defendants argue that Kim could not have been discriminated against because Kim "was warned about her job lacking value long before she requested a modified schedule to care for her daughter and her eventual role elimination." Defs. Brf. at 11. But Defendants misread the complaint. The FAC alleges that Katiyar became aware of Jane's health disabilities when he became Kim's manager, FAC ¶¶ 35-36, and, as a result, at the time Katiyar made his discriminatory statements about Kim's work being "tactical" and "useless," Katiyar was aware of Kim's role as a caregiver to a significantly disabled child. Moreover, Katiyar only fired Kim days after she made a written request for "flexibility" to care for her daughter. Id. ¶ 75.[5]

In short, Kim's allegations, alone and in combination, are sufficient to meet Kim's minimal burden at the pleading stage to show that Defendants discriminated against her. Defendants' self-serving explanations are best left for a jury.

**III.    Disability Discrimination**

Federal and local laws make it unlawful for an employer to discriminate against an employee based on her disability. Here, Defendants argue that Kim cannot show that she is disabled under the ADA because her medical impairments were only temporary. Defs. Brf. at 14. But that argument is largely irrelevant because Defendants do not argue – nor can they – that Kim is unable to meet the definition of disability under the local statutes. For instance, the local statutes do not "require a showing that the disability substantially limits a major life activity." Katz v. Adecco USA, Inc., 845 F. Supp. 2d 539, 548-49 (S.D.N.Y. 2012); see Kirkland-Hudson

---

[5]    Katiyar is free, of course, to argue to a jury that the timing of Kim's firing, only days after her email, was a mere coincidence, or that there was a "legitimate reason for [Kim's] termination." Defs. Brf. at 11. These are not, however, bases to dismiss Kim's claims at the pleading stage. See Kelleher, 939 F.3d at 470 ("On a motion to dismiss, [the court] do[es] not consider potential nondiscriminatory reasons for termination; [the court] examine[s] the complaint to determine whether it contains 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'") (quoting Littlejohn, 795 F.3d at 311).

v. Mount Vernon City Sch. Dist., 665 F. Supp. 3d 412,  457 n. 6 (S.D.N.Y. 2023) ("One key difference between the NYSHRL and the ADA is that the NYSHRL has a broader definition of disability than does the ADA in that it does not require a showing that the disability substantially limits a major life activity.")  Rather, "an individual can be disabled under the [NYCHRL] if his or her impairment is demonstrable by medically accepted techniques" Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC 15 F. Supp. 3d 274, 282 (E.D.N.Y. 2014), or a "medically diagnosable impairment" under the NYSHRL.  Kirkland-Hudson, 665 F. Supp. 3d at 457 n.6. Here, there is no dispute that Kim's medical conditions, her injured hand and contracting COVID, meet this low bar.

Defendants also claim that Kim has not plausibly alleged that Defendants took adverse actions against her that were motivated, at least in part, by her disability.  Defs. Brf. at 15.  But for the same reasons alleged above, Defendants' argument is meritless.  Kim has alleged that after returning from medical leave, Katiyar lashed out at her to such an extent that she felt genuinely frightened, shouted that her work was unimportant and useless, refused to include her in meetings with stakeholders, and belittled her work.  FAC ¶¶ 46-47.  Kim directly told Katiyar that his refusal to allow her attend meetings with stakeholders was impacting her ability to perform her job.  Id. Section IV ¶ 54.  In response, Katiyar became aggressive and angry and told Kim that she would never be promoted in part because "it's all about … what perceptions [Kim] create[d], clearly referring Kim's requests for protected leave and her responsibilities taking care of Jane.  Id. Section IV ¶ 55.  After she returned from leave, Katiyar also continued to threaten Kim that she would never get promoted to a senior director position.  Id. Section IV ¶ 59. Katiyar's refusal to allow Kim to attend meetings with stakeholders significantly modified her job duties and, as she told him, directly affected her ability to successfully fulfill her job

16

responsibilities.  Kim has alleged sufficient facts from which a factfinder could infer that Defendants knowingly modified Kim's job responsibilities and threatened her future work opportunities.  That is sufficient to raise an inference of discrimination on the basis of her disability.

Further, Defendants claim that there is "no suggestion or inference that Plaintiff's disability played any role in the decision to terminate her employment nearly nine months later." Defs. Br. at 15.  Once again, Defendants are wrong.

In assessing temporal proximity, a factfinder must do more than simply count the number of days between events.  See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) ("[w]e have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship") (internal quotations omitted).  Rather, "[a] court may overlook a longer gap in time" where the "pattern of [unlawful] conduct begins soon after" the employer gains the requisite knowledge and "only culminates later in" adverse action. Laudadio v. Johanns, 677 F. Supp. 3d 590, 614 (E.D.N.Y. 2010) (quoting Billue v. Praxair, Inc., No. 3:05 Civ. 00170 (JCH), 2007 WL 1231841, at *8 (D. Conn. Apr. 26, 2007), aff'd No. 07 Civ. 2359, 2008 WL 4950991 (2d Cir. Nov. 20, 2008).  In short, a court, like a fact finder, must "exercise . . . judgment" and consider the facts in their totality.  Espinal, 558 F.3d at 12.

Here, as detailed *infra* in Section II, Katiyar's adverse actions (hostile statements, false criticisms, etc.), began immediately after Kim returned from medical leave "set in motion the events that ultimately led to Plaintiff's termination."  See Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015) (employee discharged more than two years after her medical leave stated plausible claims for disability discrimination because

17

immediately after her return, she was assigned different job responsibilities that the employer knew would make her job more difficult to perform).

## IV.    Retaliation

Federal and local laws also prohibit an employer from retaliating against an employee for protesting discrimination or seeking accommodation.  Mihalik, 715 F.3d at 112; Limauro v. Consol. Edison Co. of New York, Inc., No. 20 Civ. 03558 (CM), 2021 WL 466952, at *10 (S.D.N.Y. Feb. 9, 2021).  Defendants, however, wrongly claim that Kim did not engage in any protected activity.

First, protected activity is not limited to formal protests.  Hubbard v. Total Comm'ns, Inc., 347 F. App'x 679, 680 (2d Cir. 2009).  Rather, any expression or disapproval is protected. Crawford v. Metro. Gov't of Nashville & Davidson Cnty. Tenn., 555 U.S. 271, 276 (2009). "[A]ny activity designed to 'resist or antagonize. . .; to contend against; to confront; resist; [or] withstand'. . . constitutes a protected oppositional activity."  Littlejohn, 795 F.3d at 317 (quoting Crawford, 555 U.S. 271, 276 (2009).  Moreover, no "magic words" are required.  Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 363 (S.D.N.Y. Aug. 16, 2012); see Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d, 331 (S.D.N.Y. 2020) ("When an employee communicates to her employer a belief that the employer has engaged in [unlawful activity], . . . that communication *virtually always* constitutes the employee's opposition to the activity.") (quoting Littlejohn, 795 F.3d at 317) (emphasis in original).

Here, Kim undoubtedly engaged in protected activity when (1) on January 25, 2024, Kim reported Katiyar's aggressive and unlawful behavior to Abby Cahn, the Executive Director of Eylea, and reported to HR that Katiyar was subjecting her to a hostile treatment and refusing to include her in meetings and conversations about competitive intelligence after she returned from

18

medical leave in July 2023 (FAC Section V ¶¶ 52-62); this was on its face a complaint about the working conditions Kim was subjected to after she returned from medical leave for her own disability; (2) on February 1, 2024, Kim reported to HR that she needed temporary flexibility in her schedule to care for her child with significant health disabilities, but was afraid of the backlash from Katiyar if she took additional time off, clearly indicating Katiyar's retaliatory response to Kim's own medical leave and concern about retaliation based on being a mother in a caregiving role with a sick child (id. ¶ 68); (3) during the same conversation, Kim also reported to Jones that she was very concerned about Katiyar's response if she missed a meeting to care for her daughter, which again clearly indicated Katiyar's retaliatory response to Kim's medical leave and Kim's concern about retaliation based on being a mother in a caregiving role with a sick child (id. ¶¶ Section V 64-70); (4) on February 8, 2024, Kim reported Katiyar's increasingly abusive behavior to Balasundaram, who was Katiyar's direct manager (id. Section VI ¶ 74); and (5) Kim requested an accommodation of flexibility in her schedule to care for her child with health disabilities.  Any of these complaints alone can constitute protected activity; taken together, as they must be at this stage, Kim has plausibly alleged that she engaged in protected activity.

Second, there can be no doubt that Kim requested accommodation for her disabilities under the local statutes.  In June 2023, she requested, and was granted, time off to tend to her condition.  FAC ¶¶ 42-44.  In December 2023, she requested time off because she contracted COVID.  Id. ¶ 53.  As explained above, Defendants began to retaliate against Kim immediately thereafter.

19

## V.    Individual Liability

Defendants are also wrong when they argue that Katiyar cannot be held liable under the local statutes.  The NYCHRL expressly makes it unlawful for "an employer or an employee or agent thereof" to discriminate.  N.Y.C. Admin. Code § 8-107(1)(a) (emphasis added).  In other words, the statute "imposes primary liability on employees."  Doe v. Bloomberg, L.P., 36 N.Y.3d 450, 459 (2021).[6]  "The statute also prohibits 'any person' from . . . from retaliating against another person for engaging in certain protected activities."  Id. at 454 (quoting N.Y.C. Admin. Code § 8-107(6) and (7)).  Alternatively, both the state and city laws make it unlawful for "any person" to "aid and abet" discrimination.  N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code. 8-107(6).  "[U]nder this framework, 'a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' can be held individually liable as an aider and abettor." Bonaffini v. City Univ. of New York, No. 20 Civ. 5118 (BMC), 2021 WL 2895688, at *2 (E.D.N.Y. July 9, 2021) (quoting Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004)) (quoting Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004) (cleaned up)).  "This extends to personal liability 'for aiding and abetting allegedly unlawful discrimination by [an] employer even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability,' so long as the employer's conduct has also been found to be discriminatory under the NYSHRL."  Xiang v. Eagle Enters., LLC, No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *4 (S.D.N.Y. 2020) (alteration in original) (quoting Conklin v. County of Suffolk, 859 F. Supp. 2d

---

[6]    Defendants misunderstand the New York Court of Appeals ruling in Doe, which holds that an individual cannot be held vicariously liable for the unlawful discriminatory or retaliatory acts of another.  36 N.Y.3d at 463.  Kim has not asserted a vicarious liability claim against Katiyar.

20

415, 436 (E.D.N.Y. 2012)).  In short, Katiyar is liable both as a "primary" actor and an "aider and abettor."

As detailed herein, Katiyar participated not only in Kim's termination, but also personally participated in the discrimination and retaliation against Kim.  The allegations in the FAC more than adequately establish Katiyar's individual participation and this stage under both the NYSHRL and NYCHRL.

## VI.    The Earned Safe and Sick Time Act

The New York City Earned Safe and Sick Time Act ("ESTTA") provides employees the right to use safe and sick time for the care and treatment of themselves or a family member. N.Y.C. Admin. Code § 20-924.  Defendants argue that Kim is not entitled to bring an ESTTA claim in this forum because it was not until after her termination that the law was expanded to allow employees to file either an administrative complaint *and/or* a civil lawsuit.  Defs. Br. at 22. However, this reading of the legislation does not comport with the purpose and plain language of the amendment.

The plain language of the amendment states that effective March 20, 2024, an individual may commence a civil action "within 2 years of the date the person knew or should have known of the alleged violation."  That is exactly what Kim did.  The language of the amendment plainly contemplates a two-year lookback period, meaning that as of March 20, 2024, an individual may commence a civil action if a violation occurred within the previous two years.  If the legislature intended the two-year lookback period to begin as of March 20, 2026 such that the violation had to occur from March 20, 2024 onward, they would have said so.  They did not.

Further, the statute meets the test for retroactivity because of its "remedial purpose," Callahan v. HSBC Securities (USA) Inc., 723 F. Supp. 3d 315, 326 (S.D.N.Y. 2024), namely, to

21

allow workers who experience violations of employment law to bring all of their claims in one forum to avoid filing some claims against an employer in an administrative agency and others in court. See NYC City Council Hearing Transcript, December 20, 2023 at page 47. Importantly, the legislature did not create a new cause of action but simply "expanded . . . [its] protections consistent with the statute's original purpose." Callahan, 723 F. Supp. 3d at 326. Accordingly, the amendments "should be given retroactive effect in order to effectuate [their] beneficial purpose." Id.

Finally, as detailed, *supra*, Kim has established that Defendants interfered and retaliated with her attempt to exercise her rights under the ESSTA by (1) failing to provide her with the appropriate information and forms related to her right to leave to take for her daughter, (2) engaging in acts of intimidation, threats and harassment (3) threatening her position, (4) diminishing her role, and (5) terminating her employment in violation of the ESSTA.

## CONCLUSION

For the foregoing reasons, Kim respectfully requests that the Court deny Defendants' partial motion to dismiss.

Dated: November 25, 2024
      New York, New York          Respectfully submitted,

                                    **WIGDOR LLP**

                                    By: _____
                                          Monica Hincken
                                          Valdi Licul

                                    85 Fifth Avenue
                                    New York, New York 10003
                                    Telephone: (212) 257-6800
                                    Facsimile: (212) 257-6845
                                    mhincken@wigdorlaw.com
                                    vlicul@wigdorlaw.com

                                    *Counsel for Plaintiff*

22